UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-6155-JMS

UNITED STATES OF AMERICA,

v.

FABIO LOPEZ,

          Defendant.
_____/

FILED BY_____D.C.

MAR 17 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## DETENTION ORDER

THIS MATTER came before the Court upon the Government's motion to detain the Defendant, Fabio Lopez, prior to trial and until the conclusion thereof. Having received evidence and heard argument of counsel, and having considered the statutory factors in 18 U.S.C. §3142(g), the Court hereby GRANTS the Government's motion and hereby orders Defendant Fabio Lopez detained prior to trial, for the reasons stated on the record at the hearing and as further discussed below in accordance with the provisions of 18 U.S.C. § 3142(i).

A.    INTRODUCTION

The Defendant is charged by criminal complaint with enticement of a minor to engage in sexual activity and attempted production of child pornography, in violation of Title 18, United States Code, Sections 2422(b) and 2251(a) and (e), respectively. The United States seeks detention on the bases of risk of non-appearance and danger to the community. On March 16 and 17, 2020,[1]

---

[1] The hearing commenced on March 16, three days (excluding an intermediate Saturday and Sunday) from the Defendant's initial appearance on March 11, 2020, based on the Government's motion for a continuance. After conducting the hearing for approximately one hour and ten minutes, the hearing was adjourned and continued to the following day at the Defendant's request for two reasons. First, the Defendant indicated an intent to call several witnesses on his behalf who required the services of a Spanish-language interpreter. The Defendant had not arranged with the Court to have such interpreters available at the hearing. In order to ensure that his witnesses could testify using the interpreters, the Defendant accepted the Court's invitation to continue the hearing until March 17. Second, the Defendant demanded that the Government produce a copy of text messages, sent by an undercover agent to the Defendant in the guise of the minor victim alleged in the complaint, as "Jenks" material pursuant to Fed.

1

the Court held a hearing to determine whether any condition or combination of conditions of release will reasonably assure the appearance of the defendant as required and the safety of any person and the community. 18 U.S.C. § 3142(f). The Government must establish by preponderance of the evidence that no condition or combination of conditions will reasonably assure the defendant's appearance as required. *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). The Government must establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any individual or the safety of the community. 18 U.S.C. § 3142(f)(2). Based upon the evidence presented, as further discussed below, the Court finds probable cause that the Defendant committed an offense involving a minor victim under Title 18, United States Code, Section 2422 and Section 2251. This finding gives rise to a rebuttable presumption that no condition or combination of conditions of release will reasonably assure the appearance of the Defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(E). Assuming, *arguendo*, that a defendant comes forward with sufficient evidence to rebut the statutory presumption, the presumption "remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence." *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990); *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988). Throughout this proceeding, the burden of persuasion is upon the Government to establish by clear and convincing evidence that the defendant poses a danger to the community, 18 U.S.C. § 3142(f), and/or to establish by a preponderance of the evidence that he poses a risk of flight. *Quartermaine*, 913 F.2d at 917. In determining whether the Government has met its burden

---

R. Crim. P. 26.2 and 18 U.S.C. §3500. Because it was unclear whether such messages fall within the scope of Rule 26.2, and because the messages were not available at the time of the hearing, the adjournment afforded the Government time to produce the text messages or provide authority in support of its argument that disclosure of such messages is not required. At the resumption of the hearing on March 17, the Government indicated that, while it maintained its position that the text messages did not constitute "Jenks" material, the Government was nonetheless providing a copy of the text messages to the Defendant. The Court, therefore, made no finding as to whether the text messages do, or do not, fall within the scope of Rule 26.2 and §3500.

by the requisite standard of proof, this Court must take into account the factors enumerated in 18 U.S.C. § 3142(g).

B.  FINDINGS OF FACT

The evidence adduced at the pretrial detention hearing consisted of the information contained in the Pretrial Services Report, the criminal complaint (DE 1), the testimony of HSI Special Agent Vanessa Juede, the testimony of the Defendant's sister-in-law, Yaninna Pazmino, proffers by counsel for the Government and for the Defendant (including proffers about the willingness of the Defendant's wife and numerous other family members to pledge their property as collateral for a bond), and an exhibit consisting of a photograph taken by agents during search of a hotel room discussed below. The Court considers all of this evidence in making its findings.

1.  Government's Evidence

The affidavit in support of the criminal complaint, which Special Agent Juede adopted as her directed testimony, stated, in pertinent part, that:

> On January 20, 2020, a 16 year old female child ("Victim 1") and her mother, H.L., responded to the Pembroke Pines Police Department to report that LOPEZ had committed a sexual battery upon Victim 1 by touching her breasts and her vagina. H.L. advised law enforcement that she had traveled out of the country in November of 2018 and met LOPEZ at the Miami International Airport where he was then, and currently remains, employed as an officer for Customs and Border Protection ("CBP"). H.L. advised law enforcement that she met LOPEZ while being detained by him on the jet way as she departed for an international flight. H.L. advised that LOPEZ asked her for her phone number. H.L. provided LOPEZ with her phone number and developed a friendship with him. During the course of their friendship, LOPEZ visited H.L.'s residence and was introduced to H.L.'s minor children: Victim 1 and her brother. LOPEZ was made aware that Victim 1 was a minor.
>
> H.L. discussed her and her children's residency and citizenship status in the United States with LOPEZ on various occasions. As an officer for CBP, LOPEZ gave H.L. the impression that he could help her and her family with their residency. H.L reported that she was in fear of LOPEZ because he told her he had the power to "send people away" and "disappear immigrants at the border."

3

In July 2019, while H.L was out of the country, LOPEZ took Victim 1 and other family members on a boat trip. LOPEZ was subsequently given Victim 1's phone number to coordinate details of the outing. After the trip, from about July 2019 through about January 2020, LOPEZ began texting Victim 1 using the web-based application "WhatsApp," in addition to direct cellular telephone calls. During the conversations using a cellular telephone, LOPEZ made comments to Victim 1 about how beautiful she was and told her that he was there to help her. LOPEZ advised Victim 1 he could provide her with money if she needed it, and offered to pick her up from school on several occasions.

On January 17, 2020, LOPEZ coordinated a meeting with Victim 1 using a cellular telephone and arranged to meet Victim 1 in the parking lot of her apartment complex in Pembroke Pines, Florida. Victim 1 advised law enforcement that LOPEZ was dressed in his CBP uniform and had a firearm displayed on his waist during this meeting. LOPEZ told Victim 1 to sit in the passenger seat of his SUV. While parked in a parking spot, Victim 1 reported that LOPEZ instructed her to recline the passenger seat and lay back. LOPEZ told Victim 1 that she could make money by letting him take "sexy" photographs of her in lingerie that would reveal her genitals and breasts. LOPEZ further explained to Victim 1 that he would be the one taking the photos and that they could go to a hotel to take them. Because Victim 1 was in fear of LOPEZ, she feigned interest in taking the photos. LOPEZ then fondled Victim 1's breasts, placed his hand inside of her underwear, and began to touch her vagina. LOPEZ then asked Victim 1 if he could kiss her and Victim 1 refused. Victim 1 subsequently told her mother what had transpired and they went to the police station.

On January 21, 2020, via text message, LOPEZ and Victim 1 had a conversation about him taking photos of her. LOPEZ reiterated to Victim 1 that he wanted to take pictures of her in sexy lingerie and that she would be paid $90.00 in exchange for producing the photos. LOPEZ further stated that when the photographs were approved by another unknown co-conspirator, Victim 1 would receive $1500.00 to $4,000.00 every six months. LOPEZ assured Victim 1 that *he* would be the one taking the photos and that *he* would take her to a safe place. LOPEZ also told Victim 1 that her mother would never have to know about the photographs. LOPEZ also instructed Victim 1 not to tell anyone else as they would be jealous because there was a lot of money involved.

Law enforcement conducted a recorded controlled call with LOPEZ from Victim 1's cellular telephone. During the call, Victim 1 told LOPEZ she was frightened by his touching her. LOPEZ responded by asking for forgiveness and telling Victim 1 it would never happen again. During the conversation LOPEZ admitted to touching Victim 1's vagina.

In February of 2020, Homeland Security Investigations (HSI) Fort Lauderdale received a request for assistance from Pembroke Pines Police Department in regards to this investigation. On February 27, 2020, law

4

enforcement received consent from H.L. to assume the persona of Victim 1 on her cellular telephone. On February 28, 2020, an agent acting in an undercover ("UC") capacity purporting to be Victim 1, texted with LOPEZ regarding how and when to take the photographs they had previously discussed. Despite indicating that he did not want to communicate via text message, LOPEZ texted the UC purporting to be Victim 1 and repeatedly attempted to schedule an in person meeting with her.

On March 9, 2020, during a text message conversation with the UC purporting to be Victim 1, LOPEZ communicated to the UC purporting to be Victim 1 that she should shave in between her legs to prepare for the photographs. LOPEZ confirmed that he would focus the camera in between Victim 1's legs and that her face would not be depicted in the image.

The UC purporting to be Victim 1 texted with LOPEZ and expressed her nervousness regarding taking the photographs and asked LOPEZ if he would bring her favorite snacks to calm her; flaming hot Cheetos and Nutella.

LOPEZ and the UC purporting to be Victim 1 scheduled an in person meeting in Davie, Florida. On March 10, 2020, LOPEZ arrived at the meeting location and was taken into custody. LOPEZ was read his <u>Miranda</u> warnings and knowingly waived them. In a video and audio recorded interview, LOPEZ advised law enforcement that he had reserved a hotel room to take Victim 1 back to. LOPEZ indicated that he had gone to the hotel earlier in the day to drop off Victim 1's favorite foods and lingerie. LOPEZ provided law enforcement with consent to search the hotel room where officers recovered several items of lingerie as well as prescription medication for erectile dysfunction. LOPEZ informed law enforcement that he intended to take photographs of Victim 1 wearing the lingerie with the camera on Victim 1's cellular telephone.

In addition to testimony, the Government introduced an exhibit consisting of a photograph showing one of the pieces of lingerie found in the hotel room the Defendant reserved. Based on the photograph, consistent with the Government's description, the lingerie appears designed to leave female genitalia uncovered. The Government further proffered that a forensic review of the Defendant's phone seized upon his arrest revealed that all of the WhatsApp messages he had exchanged with the victim (or the undercover agent posing as the victim) had been deleted from his phone other than those exchanged on the day of the Defendant's arrest.

On cross-examination of Special Agent Juede, Defendant's counsel elicited that the Defendant maintained a friendly relationship with H.L., that the Defendant had been invited into

H.L.'s home, and that the Defendant had not forced anyone to go on the boating trip described in the complaint. Agent Juede stated that H.L. is currently in the United States under asylum, has a temporary travel document, and has traveled outside of the United States without her family. Defense counsel also elicited that Agent Juede (posing as the victim) contacted the Defendant by text message and insisted that their conversations be over text, rather than by phone call, despite the Defendant's reluctance to correspond by text message. Agent Juede also admitted that her message (posing as the victim) to the Defendant asked if she needed to shave between her legs (as opposed to the Defendant suggesting the idea) and requested that the Defendant bring specific food to their arranged meeting. The texts that Agent Juede sent, in the guise of the minor victim, also included statements suggesting that the victim was sad, lonely, having trouble with her mother, or otherwise feeling bad about herself.

On re-direct examination, Agent Juede testified that text messages from the Defendant to the minor victim preceding the undercover investigation included offers to pay the minor victim for posing for photographs. She also testified that, prior to HSI's involvement in the case, the Pembroke Pines Police Department had the victim place a recorded, monitored phone call to the Defendant, wherein the Defendant admitted to touching the victim's vagina "on top" during the January 17, 2020, incident described in the complaint. She also stated that, in response to the Defendant's reluctance to correspond by text message, the undercover agent (posing as the victim) stated that she was afraid to speak to him on the phone. Agent Juede testified that, following that exchange, the Defendant continued their conversation about taking photographs.

Having observed the testimony of Special Agent Juede, the Court finds the agent to be credible. Furthermore, the Court finds that the Defendant's cross-examination did little to undermine the credibility of the allegations made by the minor victim and her mother or the other

6

allegations in the complaint affidavit. The undersigned therefore accepts the facts set forth in the Affidavit as true for purposes of its bond determination. Furthermore, to the extent that the Defendant's questioning elicited testimony that the undercover agent initiated contact with the Defendant, and made suggestions about how the minor victim should prepare for her meeting with the Defendant and what food the Defendant should bring, none of this testimony undermined the evidence suggesting that the Defendant freely and voluntarily engaged in these conversations, responded to the undercover agent's suggestions, understood the sexual nature of the arrangements they were discussing, and ultimately arrived to meet the person he knew to be a minor.

2. Defendant's Evidence

The Defendant called his sister-in-law, Yaninna Pazmino, to testify in order to establish that Ms. Pazmino and her husband (the Defendant's brother) could provide a suitable residence where the Defendant could remain on home detention if granted a bond. She emphasized that there were no minor children in her home, that her husband is at home all day, and that she and her husband would be able to adequately supervise the Defendant to ensure his compliance with his bond. Ms. Pazmino also testified that she and her husband were willing to use their home (with an approximate equity value of $200,000) as collateral for a corporate surety bond, even with the understanding that they could lose their home if the Defendant failed to appear for court. Ms. Pazmino also testified that numerous other family members, including the Defendant's wife, niece, and nephew, all of whom were present in court, were willing to pledge their property as collateral.[2]

Finally, Ms. Pazmino testified that she has known the Defendant for approximately 35 years and has been in close contact with him. She described the Defendant as "tip top in every respect," and an excellent brother, family member, and friend. She further described the Defendant as a

---

[2] According to the Pretrial Services Report, and defense counsel's proffer, the home the Defendant owns with his wife has a market value of approximately $600,000.

7

person of excellent morals and someone whose reputation was inconsistent with any kind of sordid behavior. On cross-examination, however, Ms. Pazmino admitted that she had no knowledge of the incidents giving rise to this case, nor did she have knowledge that the Defendant was conducting an extramarital relationship with H.L. or her daughter. She further admitted that the conduct described in the complaint and by the prosecutor was inconsistent with the person she knew and what the Defendant would tell her about himself.

3. Pretrial Services Report

According to the Pretrial Services Report, the Defendant is 62 years old. He was born in Cali, Colombia, and became a naturalized U.S. Citizen approximately 30 years ago. He has resided in South Florida for approximately 20-25 years and he lives with his wife and two teenaged children. Prior to his arrest, he had stable employment as a U.S. Customs and Border Protection agent (although defense counsel conceded that he would likely be suspended from that employment based on the instant charges), and he has significant financial resources and assets, including two residences and several motor vehicles. He has no criminal history, history of mental illness, or history of substance abuse. He has traveled frequently outside of the United States in the last ten years, to several countries, including Colombia, where he owns a time share. His mother (who, as mentioned during the hearing, is 93 years old) resides in Colombia.

C.   STATEMENT OF REASONS FOR DETENTION

Title 18, United States Code, Sections 3142(g) requires the Court to consider the nature and circumstances of the offense, the weight of the evidence against Defendant, the history and characteristics of the Defendant, and the nature and seriousness of any danger to a person or to the community caused by the Defendant's release. After considering those factors in detail as described below, and based upon the above findings of fact, the Court specifically finds by a

preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance at trial, and specifically finds by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.  18 U.S.C. § 3142(e).

1. <u>The nature and circumstances of the offense charged.</u>

The Defendant is charged with enticement of a minor to engage in sexual activity, in violation of Title 18, United States Code, Section 2422(b), and attempted production of child pornography, in violation of Title 18, United States Code, Section 2251(a) and (e).  If convicted of both charges, he faces a mandatory minimum sentence of 15 years' imprisonment and a maximum sentence of life imprisonment.  Based on the Government's proffer, because the offense includes a sexual battery on a minor, the Government estimates that his advisory guideline range will be life imprisonment.

The nature of these offenses are that they cause direct physical and emotional harm to persons.  Importantly, these specific offenses involve harm to particularly vulnerable persons – minor children.  It is also significant that the Defendant's alleged actions involved actual physical molestation of a minor rather than solely theoretical or planned-but-not-accomplished contact.

The Court also finds it quite significant and troubling that the Defendant allegedly engaged in the charged conduct while entrusted with the authority of a United States Customs and Border Protection Officer.  Indeed, based on the unrebutted statements of the minor victim and her mother, the Defendant abused the power of his position and exploited the fear of people with tenuous status in the United States in committing the alleged conduct.  As such, this factor creates a strong inference that the Defendant presents a danger to other individuals as well as to the community at large.

2. <u>The weight of the evidence against Defendant.</u>

The weight of the evidence against the Defendant is strong. As discussed above, the evidence of the Defendant's sexual contact with the minor victim is based on both that victim's testimony and a corroborating recorded phone call placed by the victim to the Defendant under the monitoring of local police. The text messages the Defendant exchanged with the victim, even before the undercover agent assumed the victim's identity, further corroborate the victim's description of the Defendant's offer to take sexualized pictures of her for money. Once the undercover agent assumed the victim's identity, the Defendant continued to engage in preserved text message conversations that included discussion of the Defendant meeting the person he knew to be a minor child for the purpose of taking photographs. Regardless of who suggested specifics about how the minor victim should shave herself in preparation for such a meeting, the evidence suggests that the Defendant did not cease the discussions but rather continued to arrange a meeting with the minor victim. There is also evidence that the hotel room, which the Defendant admitted to reserving, contained lingerie designed to reveal female genitalia and erectile disfunction medication. This is compelling evidence, consistent with the preserved text messages and the Defendant's post-*Miranda* statements, suggests that he intended to take sexually explicit photographs of the minor victim, and indeed that he intended to engage in sexual intercourse with her.

Whether this evidence ultimately constitutes proof beyond a reasonable doubt will be decided elsewhere, and the Defendant undoubtedly retains the presumption of innocence. *See* 18 U.S.C. 3142(j). However, the evidence as presented is sufficiently strong to motivate a defendant not to appear in court, particularly a defendant who is facing the possibility of life imprisonment. There is also compelling evidence that the Defendant, over the course of at least

a few months, attempted to persuade at least one minor child to engage in sexual conduct and to pose for the creation of child pornography. This evidence creates a strong inference that the Defendant poses both a risk of non-appearance and a continuing danger to the community.

3. Defendant's history, characteristics, and criminal history.

The Defendant maintains very significant ties to the South Florida community, including his wife, teenaged children, brother and sister-in-law, and others who attended the detention hearing in support of him. He has lived in South Florida for an extensive time, he owns significant property here, and, at least until the time of his arrest, had stable employment. He has significant financial assets, and his family is willing to risk significant property by using it to secure a bond on his behalf. In other words, he would have a lot to lose by fleeing South Florida, both in terms of contact with his family as well as the financial harm he could bring upon himself and any family members who provided collateral for a bond. He has no criminal history nor history of mental health problems or substance abuse. All of this weighs heavily against the argument that he is a risk of flight.

The Defendant, does, however, have some significant foreign contacts, most notably with his country of origin, Colombia. According to the Government, the Defendant retains his Colombian citizenship. His mother resides there, he owns a time-share there, and he has traveled there in recent years. The Defendant's significant financial assets in South Florida weigh in favor of his ties here, but they also suggest that he has the resources to flee if he so chooses.

Furthermore, the Court must consider the Defendant's character. While his history and his sister-in-law's testimony paint the picture of a moral and responsible man, the allegations in this case (supported by significant evidence described above) paint a very different picture. In

fact, as illuminated in the cross-examination of Ms. Pazmino, they paint the picture of someone who has been deceiving those close to him. The fact that the Defendant may have engaged in the alleged conduct while entrusted with the authority of a United States Customs and Border Protection Officer only compounds this picture of betrayal and abuse of trust.

4. The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release.

As described above, there is persuasive evidence that the Defendant induced a minor child to engage in sexual activity and attempted to produce child pornography. As described above, these alleged crimes involve not just emotional and physical pain for an individual, but a particularly vulnerable individual – a minor child. The nature and seriousness of the danger the Defendant poses is therefore significant.

5. Conclusion

The Defendant proposes that a high corporate surety bond, with his wife, brother, and sister-in-law pledging their homes as collateral, combined with home detention under the supervision of his brother and sister-in-law (in a home without children), would have a sufficient combination of conditions to mitigate both the Defendant's risk of non-appearance and his danger to the community. However, even assuming the Defendant has brought forth sufficient evidence to rebut the presumptions that the charges bring forth, the undersigned cannot agree. While the proposed conditions would create a high price for the Defendant to flee or otherwise fail to appear in Court, the strength of the Government's case, combined with the likelihood of a 15-year mandatory sentence for a 62-year-old defendant and the possibility of a guideline range of life imprisonment, creates an exceptionally high incentive for the Defendant to flee. The fact that the Defendant has apparently so deceived his family, while serving as a trusted Government official, undermines the undersigned's confidence that he would abide by the conditions of bond. For

similar reasons, the undersigned is not convinced that the conditions of bond would mitigate the serious danger the Defendant poses to the community.

D. DISPOSITION

Being fully advised, the Court hereby ORDERS that the defendant, Fabio Lopez, be detained prior to trial and until the conclusion thereof.

The Court further ORDERS:

1. That the Defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. That the Defendant be afforded reasonable opportunity for private consultation with counsel; and

3. That, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the Defendant to a United States marshal for the purpose of an appearance in connection with a court proceeding.

DONE AND ORDERED at Fort Lauderdale, Florida this 17th day of March 2020.

*Jared Strauss*
Jared M. Strauss
United States Magistrate Judge

Copies to:

Joaquin Perez, Esq.
Attorney for Fabio Lopez

Jodi Anton, Esq.
Assistant United States Attorney

United States Marshal
United States Pretrial Services